IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No.

**STEVEN M. WREN**, **individually,**

Plaintiff,

v.

**EL PASO COUNTY SHERIFF'S OFFICE; EL PASO COUNTY, COLORADO; SHERIFF BILL ELDER, individually and in his official capacity with the El Paso County Sheriff's Office; LIEUTENANT BILL HUFFER, individually and in his official capacity with the El Paso County Sheriff's Office; DEPUTY SCOTT BRETTELL, individually and in his official capacity with the El Paso County Sheriff's Office; DEPUTY NICHOLAS WITHERITE, individually and in his official capacity with the El Paso County Sheriff's Office; and DEPUTY JEREMY JUHL, individually and in his official capacity with the El Paso County Sheriff's Office.**

Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, by and through his undersigned counsel, submits this Complaint and Jury Demand and, in support thereof, states as follows:

### PARTIES

1.    Plaintiff Steven M. Wren ("Mr. Wren" or "Wren") is a citizen and resident of Williamson County in the State of Texas.

2.    Defendant El Paso County Sheriff's Office ("EPSO") is a Colorado public entity with its principal place of business located at 27 East Vermijo Avenue, Colorado Springs, CO 80903.

3.    El Paso County, Colorado ("El Paso County") is a Colorado public entity with its principal place of business located at 2880 International Circle #110, Colorado Springs, Colorado

80910.

4.      Sheriff Bill Elder is a citizen and resident of El Paso County in the State of Colorado.  At all times relevant to the allegations and claims in this lawsuit, Mr. Elder was acting in the course and scope of his employment as the Sheriff of El Paso County, Colorado.

5.      Lieutenant Bill Huffor is a citizen and resident of El Paso County in the State of Colorado.  At all times relevant to the allegations and claims in this lawsuit, Mr. Huffor was acting in the course and scope of his employment as a Lieutenant with the El Paso County Sheriff's Office.

6.      Deputy Scott Brettell is a citizen and resident of El Paso County in the State of Colorado.  At all times relevant to the allegations and claims in this lawsuit, Mr. Brettell was acting in the course and scope of his employment as a Deputy with the El Paso County Sheriff's Office.

7.      Deputy Nicholas Witherite is a citizen and resident of El Paso County in the State of Colorado.  At all times relevant to the allegations and claims in this lawsuit, Mr. Witherite was acting in the course and scope of his employment as a Deputy with the El Paso County Sheriff's Office.

8.      Deputy Jeremy Juhl is a citizen and resident of El Paso County in the State of Colorado.  At all times relevant to the allegations and claims in this lawsuit, Mr. Juhl was acting in the course and scope of his employment as a Deputy with the El Paso County Sheriff's Office.

## JURISDICTION AND VENUE

9.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different States.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) as

Defendants reside in Colorado and the events or omissions giving rise to Plaintiff's claims occurred in Colorado.

## TIMELY NOTICE OF CLAIM GIVEN

11.     Pursuant to C.R.S. § 24-10-109, Mr. Wren provided timely written notice of his claims to Defendants and more than 90 days have passed since Mr. Wren sent his written notice of claim to Defendants.  Specifically, within 182 days of the date of the tortious conduct complained of herein, Mr. Wren sent written notice of his claims via registered mail, return receipt requested, to Diana May, as El Paso County Attorney, and Bill Elder, as El Paso County Sheriff. The notice stated Mr. Wren's name and address; a concise statement of the factual basis of his claim, including the date, time, place, and circumstances of the acts, omissions, and events complained of; a concise statement of the nature and extent of his injuries; and a statement of the amount of monetary damages requested.  Mr. Wren did not know the names and addresses of the EPSO public employees involved in the reckless pursuit at the time he sent his notice of claim, and, therefore, that information was not contained in his notice of claim.  The return receipts for the notices of claim served upon Ms. May and Mr. Elder, respectively, were each dated April 13, 2020, thereby establishing notice of Mr. Wren's claims was sent and received within 182 days after discovery of injury suffered by Mr. Wren.  Thus, Mr. Wren satisfied the notice of claim requirement set forth in C.R.S. § 24-10-109.

## GENERAL ALLEGATIONS

### Summary of the Claims

12.     The claims against Defendants arise from their negligent and willful and wanton conduct on October 18, 2019, when EPSO employees recklessly initiated and continued a high-speed chase of a suspect driving a stolen vehicle.  More specifically, on October 18, 2019, EPSO

employees pursued a stolen truck driven by Kaleb Miles for nearly one hour all across El Paso County, starting in Falcon and going into the city limits of Colorado Springs. During the lengthy pursuit, the suspect and EPSO employees frequently reached speeds of approximately 80-100 miles per hour, drove the opposite direction into oncoming traffic on El Paso County and City of Colorado Springs roads, crossed over medians and sidewalks, ran through red lights and other traffic signals, and swerved in and out of traffic along the way. The pursuit occurred on a Friday afternoon and traffic conditions were heavy with civilian vehicles throughout much of the chase. The pursuit resulted in not one, not two, but three separate multi-car crashes at major Colorado Springs intersections, leaving a trail of wreckage and injured victims along the way.

13.     Mr. Wren happened to be sitting in his vehicle while stopped at a red light at the intersection of North Academy Boulevard and Austin Bluffs Parkway in the City of Colorado Springs when a stolen truck driven by Kaleb Miles came barreling down Austin Bluffs Parkway travelling westbound in the eastbound lanes and blew through a red light at a high rate of speed into cross-traffic travelling with the green signal, all while two EPSO vehicles driven by Deputy Scott Brettell and Nicholas Witherite, respectively, continued in pursuit. Mr. Miles's truck rammed into a vehicle driving through the intersection, careened diagonally across the intersection, bashed into a vehicle that was stopped at the red light, and then continued forward before slamming into the driver's side of Mr. Wren's vehicle and coming to a final rest. Seconds later, Deputies Brettell and Witherite sped through the same intersection and rammed Mr. Miles's truck to pin the vehicle in and take Miles into custody.

14.     Several people involved in the lengthy high-speed pursuit suffered injuries in the three separate collisions that occurred along the way, including Mr. Wren, EPSO employees, and innocent civilians.     Mr. Wren, who was working in the course and scope as a police

officer/detective with the Colorado Springs Police Department at the time of the collision, was transported to the Stetson Hills Colorado Springs Police Station and then transported to Memorial North Hospital, where he was diagnosed with multi-level compression fractures at levels T5, T11, and T12 of his Thoracic spine.  As a result of the injuries Mr. Wren suffered in this collision, the Fire and Police Pension Association determined Mr. Wren suffered a Permanent Occupational Disability, and Mr. Wren, who was 37 years old at the time of the collision, was no longer able to continue working.

### Background Regarding Kaleb Miles

15.    Kaleb Miles had a history of criminal misconduct, mainly consisting of vehicle/property theft and drug offenses.  Miles was well-known to EPSO and was wanted on outstanding warrants.  In the days leading up to October 18, 2019, Miles and his associates stole multiple vehicles within El Paso County and also engaged in the theft of gasoline from parked cars through the use of a drill and siphon technique.

16.    EPSO knew Miles's identity, knew his associates' identities, and knew where Miles and his associates resided.

17.    On October 15, 2019, Miles stole a truck that the owner left running in a driveway while the owner unlocked a gate on the property.  With the assistance of responding EPSO deputies, an OnStar ignition block was initiated, and the truck was disabled and left abandoned in the roadway where EPSO deputies were able to recover it.

18.    Days earlier, Miles and his associates also stole other vehicles and trucks in El Paso County, Colorado, and took them to a rural property where Miles was known to reside.  At this property, Miles and his associates spray painted some of the stolen vehicles in an effort to disguise them.

**EPSO Chases Miles but Terminates the Pursuit due to Safety Concerns**

19.     On October 18, 2019, Miles and his girlfriend, Brooke Macklin, were driving a stolen Nissan Frontier pickup truck that Miles had spray painted blue and red.  As Miles and his girlfriend drove to various places that morning, they passed two EPSO vehicles that were sitting on the side of a road in El Paso County.  Miles accelerated to a high rate of speed and the EPSO deputies initiated a pursuit of Miles.  But, upon information and belief, because of the rate of speed at which Miles drove away and the traffic conditions in the area at the time, the EPSO deputies called off the pursuit out of concerns over creating an unreasonable risk of danger to those involved and to innocent bystanders.

**EPSO Chases Miles a Second Time**

20.     Later the same day, October 18, 2019, EPSO received a call from a witness to a gasoline theft in progress by the Safeway fueling station situated in Falcon, Colorado in El Paso County.  The witness reported that around 12:45 p.m. he spotted Miles drilling into the gas tanks of vehicles parked in the Safeway parking lot and siphoning out the fuel into gas cans.  The witness reported that he was familiar with the suspect and knew him to be Kaleb Miles.

21.     EPSO responded to the call by dispatching multiple deputies in marked and unmarked EPSO vehicles to the scene.  As the EPSO employees arrived on scene, however, Miles had already completed his fuel theft and was just departing the Safeway.

22.     At approximately 1:00 p.m., EPSO deputies began following Miles.  EPSO also contacted the Colorado State Patrol for assistance in pursuing Miles.

23.     At approximately 1:03 p.m., Miles realized that law enforcement officers were following him, and Miles began attempting to evade the pursuing vehicles by accelerating to a high rate of speed and turning down several different roads.  In response, EPSO initiated a pursuit

of Miles that began at approximately 1:03 p.m.

24.     Over the next hour or so, at least nine different EPSO vehicles chased Miles all across El Paso County.  EPSO also called in the Colorado State Patrol to join the chase.  The chase changed directions multiple times as Miles turned down different roads, speeds by Miles and EPSO employees frequently reached approximately 100 miles per hour, and Miles engaged in evasive driving tactics in an effort to get away, including driving the wrong way down roads against oncoming traffic and cutting across grass fields and medians.  The EPSO employees pursuing Miles followed suit and also drove at high rates of speed, drove down roads against oncoming traffic, and cut across grass fields and medians.

### The First Multi-Car Traffic Crash Occurs During the Pursuit

25.     As EPSO employees continued in pursuit of Miles across El Paso County, the chase ventured near and then into the City of Colorado Springs.   The Colorado Springs Police Department was notified but declined to join the pursuit because, upon information and belief, the pursuit was deemed too dangerous in light of the traffic conditions and speeds involved.

26.     EPSO, however, continued on with the pursuit.  With Lieutenant Huffor of EPSO leading the pursuit, Miles sped down Barnes Road, which is a heavily trafficked roadway, at speeds between 70 and 100 miles per hour.  As Miles approached Austin Bluffs Parkway, another major thoroughfare in Colorado Springs, Miles slowed as traffic at the intersection had stopped for a red light.  Without considering the dangers presented to innocent motorists, Lieutenant Huffor decided to ram his EPSO vehicle into Miles's truck in an attempt to disable and spin out Miles's truck.

27.     Lieutenant Huffor saw that other vehicles driven by civilians were stopped in traffic all around Miles's truck, and Lieutenant Huffor hoped that when he rammed Miles's truck the impact would avoid the other vehicles stopped at the light.

28.     Lieutenant Huffor's efforts, however, were unsuccessful and caused a major, multi-vehicle crash that not only caused damage to innocent bystanders but also caused damage and injury to Lieutenant Huffer and his EPSO vehicle.  While Lieutenant Huffor was able to ram Miles's truck, Lieutenant Huffor's EPSO vehicle was propelled forward, colliding with unknown objects before coming to a complete stop on the median.  Lieutenant Huffor's airbags deployed and his EPSO vehicle was disabled.  Miles, however, was able to maintain control of his truck, reversed his truck and rammed civilian vehicles to bust his way out of the congestion.  Miles drove up and over the median and sped westbound down Austin Bluffs Parkway at a high rate of speed with EPSO Deputies still in pursuit.

29.     Lieutenant Huffor's battering ram maneuver at the intersection of Barnes Road and Austin Bluffs Parkway caused a chain reaction crash involving several vehicles, including Huffor's EPSO vehicle, Miles's truck, and at least four civilian vehicles.  When Lieutenant Huffor rammed Miles, the impact caused Miles's truck to catapult forward and slam into a white Ford Focus stopped in traffic in front of Miles.  The Ford, in turn, was propelled into a gray Honda civic driven by a different civilian, which was then propelled forward into the rear of a black Hyundai Sonata. As Miles fled the scene, he rammed his truck into a Ford F150 that was stopped in traffic.  All told, the first crash at Barnes Road and Austin Bluffs Parkway caused damage and injury to four civilian vehicles and the occupants thereof.  A passenger in the white Ford Focus suffered a head injury and the driver of the gray Honda suffered a neck injury that required evaluation and treatment at the St. Francis Medical Hospital emergency department.

30.     Despite the multi-vehicle collision at Barnes Road and Austin Bluffs Parkway, EPSO employees continued to pursue Miles as he sped away down Austin Bluffs Parkway.

## **The Second Multi-Car Crash Occurs During the Pursuit**

31.     A short time later a second multi-car crash on the streets of Colorado Springs occurred.  As Miles sped down Austin Bluffs Parkway, he abruptly turned onto Siferd Road, where Deputy Juhl was in pursuit in his EPSO vehicle.  Miles evaded Deputy Juhl by steering his truck westbound in the east bound lanes of Austin Bluffs Parkway.  Without considering the danagrs presented to nearby innocent motorists, Deputy Juhl rammed Miles's truck and pushed it onto the curb, which caused both Deputy Juhl's and Miles's vehicles to go into a spin.  Deputy Juhl's and Miles's truck came to a rest after colliding into a civilian vehicle that was stopped in the eastbound lanes of Austin Bluffs Parkway.

32.     Deputy Juhl's EPSO vehicle was rendered disabled in this second collision, but Miles was again able to reverse his truck, drive up and over the median, and speed away down Austin Bluffs Parkway heading towards the busy intersection at Austin Bluffs and North Academy Boulevard.

33.     Despite this second multi-vehicle collision at Austin Bluffs Parkway and Siferd Road, EPSO employees continued to pursue Miles as he sped away down Austin Bluffs Parkway.

## **The Third Multi-Car Crash Occurs During the Pursuit**

34.     A third multi-vehicle crash occurred at the intersection of Austin Bluffs Parkway and North Academy Boulevard.

35.     As Miles came barreling down Austin Bluffs Parkway travelling westbound in the eastbound lanes, he blew through a red light at North Academy Boulevard at a high rate of speed into traffic travelling with the green signal as Deputy Brettell and Deputy Witherite remained hot in pursuit.  Mr. Miles's truck rammed into a black Nissan Altima driven by a civilian, Oleeta Gilkey, who was driving southbound on Academy going through the intersection with a green

light.  The impact caused Ms. Gilkey's Nissan to spin 180 degrees, where it was struck by a white Ford Focus driven by a civilian, Julia-Rose Smith.

36.     After colliding with Ms. Gilkey's black Nissan Altima, Miles's truck careened diagonally across the intersection and bashed into a 2006 Chevrolet Equinox driven by a civilian, Gavin Ramos, that was stopped at the red light.  Miles's truck glanced off the Equinox and continued forward, slamming into the driver's side of Plaintiff Steven Wren's Chevrolet Malibu, which was an unmarked Colorado Springs Police Department vehicle.  Plaintiff Wren's Chevrolet Malibu was, in turn, shoved sideways and collided into a black Toyota Tacoma truck driven by a civilian, Caleb Pierson.  Seconds later, Deputies Brettell and Witherite sped through the same intersection and rammed Mr. Miles's truck to pin the vehicle in and take Miles into custody.

37.     Due to the severity and number of vehicles involved in the third crash, the Colorado Springs Police Department dispatched its Major Crash Team to the scene.  The Colorado State Patrol also dispatched its Major Crash Team to the scene to assist.  Each of the intersections where the three separate crashes occurred during EPSO's high-speed pursuit of Miles through the City of Colorado Springs was closed for several hours while the Colorado Springs Police Department and the Colorado State Patrol investigated, the wrecked cars were removed, and the injured parties were tended to.

38.     Many of the innocent bystanders in the third collision were injured.  Ms. Gilkey suffered injuries, including a head injury, and she was transported to Saint Francis Medical Hospital for evaluation and treatment.  Ms. Smith and the passenger riding in her car also complained of suffering injuries.  Mr. Ramos also complained of suffering injuries.  And Plaintiff Steven Wren suffered injuries in the third collision.

**Mr. Wren Suffers Career Ending Injuries from the Third Collision**

39.     Mr. Wren, who was working in the course and scope of his employment as a police officer/detective with the Colorado Springs Police Department at the time of the collision, was transported to the Stetson Hills Colorado Springs Police Station and then transported to Memorial North Hospital, where he was diagnosed with multi-level compression fractures at levels T5, T11, and T12 of his Thoracic spine.  Mr. Wren also suffered injuries to his left shoulder, arm, and hand in the collision.

40.     Over next several months, Mr. Wren treated with numerous medical providers for his injuries, including physical therapy and chiropractic care with Dr. Chad Abercrombie; physiatry care with Dr. Dwight Leggett; bilateral facet injections at the T4-T7 levels of his spine; trigger point injections, along with additional physical therapy and massage therapy; and consults and Independent Medical Examinations with Dr. Timothy Hall, Dr. Greenan at UC Health Brain and Spine Clinic, Dr. Alfred Lotman, Dr. Stephen Pehler, and Dr. Robert Messenbaugh.  After the crash, Mr. Wren was placed on a light duty position with the Colorado Springs Police Department as his injuries prevented him from continuing to work as a police officer/detective.

41.     As a result of the injuries he suffered in this collision, Mr. Wren was never able to return to work as a police officer/detective.  Mr. Wren's daily life has been marred by pain, discomfort, and physical limitations that affect everything from his sitting, standing, sleeping, and physical movements.

42.     The Fire and Police Pension Association determined that Mr. Wren suffered a Permanent Occupational Disability, and Mr. Wren, who was 37 years old at the time of the collision, was medically retired from the Colorado Springs Police Department.  Mr. Wren has not been able to return to meaningful work due to the injuries suffered in the subject collision.  Mr.

Wren has experienced bouts of anger, anxiety, fear, and emotional distress as he attempts to rebuild his life while coping with the permanent injuries suffered in the collision.  Mr. Wren has suffered physical injuries, emotional/psychological injuries, and tremendous financial loss as a result of the third collision that occurred during EPSO's high-speed pursuit of Miles.

### EPSO Employees Knew the Pursuit Created Dangers and Risks to the Safety of Others but Continued the Pursuit Anyway

43.     EPSO employees knew of, and in fact experienced firsthand, the dangers and risks of harm that the lengthy high-speed chase of Miles presented to those involved and the public-at-large.  Numerous EPSO employees witnessed Miles drive at excessive rates of speed, drive into oncoming traffic, and nearly collide with countless other vehicles numerous times.  And several EPSO employees followed suit by driving their EPSO vehicles at high rates of speed, into oncoming traffic, and weaving through traffic to avoid colliding with civilian vehicles while in pursuit of Miles for nearly one hour.  The EPSO employees knew the pursuit created dangers of harm and risks to the safety of others, and EPSO employees in fact witnessed and were involved in three separate multi-vehicle collisions along the way, but EPSO employees continued to pursue Miles despite these known and realized dangers and risks.  Examples are as follows:

44.     EPSO Sergeant Scott Robblee joined the chase but decided to back off of the pursuit when he witnessed Miles passing cars by driving westbound in the eastbound lanes on Falcon Highway.  Despite the tremendous risks of danger presented by driving against oncoming traffic at excessive speeds, however, other EPSO employees continued on with the pursuit. Approximately ten minutes after Sergeant Robblee backed off when he saw Miles drive into oncoming traffic, Sergeant Robblee rejoined the chase and saw Miles driving southbound on Marksheffel Road in the northbound lanes with EPSO deputies in pursuit.  Sergeant Robblee lost sight of the pursuit after an unsuccessful attempt to block Miles, but Sergeant Robblee heard over

the radio that the pursuit was continuing westbound into the City of Colorado Springs.

45.     Deputy Thorpe joined the chase when he spotted Miles's truck drive by at what Deputy Thorpe described as "a high rate of speed."  Miles drove through a grass field to avoid Deputy Thorpe before turning around and driving head-on at Deputy Thorpe's EPSO vehicle. Deputy Thorpe gave chase as Miles turned down many roads before heading southbound on Marksheffel Road in the northbound lanes.  Deputy Thorpe remained in the southbound lanes and attempted to pursue Miles's vehicle but, as Deputy Thorpe wrote in his report, "there was a considerable amount of traffic in the way" and Deputy Thorpe lost Miles while monitoring the radio for his location.  Deputy Thorpe then heard of a traffic accident that occurred in the pursuit of Miles at Austin Bluffs and Academy Boulevard and responded to the scene to assist with traffic control.

46.     Lieutenant Bill Huffor was working as the Watch Commander for the EPSO Patrol Division day shift when he heard over the radio that EPSO deputies initiated but then terminated a pursuit of Miles on the morning of October 18, 2019.  Later that afternoon, Lieutenant Huffor heard EPSO dispatch units to the Safeway parking lot in response to a report of Miles stealing fuel. Lieutenant Huffor decided to respond to the call himself and drove his unmarked EPSO Jeep towards the scene; when Miles left the scene, Lieutenant Huffor joined the chase.   During Lieutenant Huffor's involvement in the chase, he witnessed the following:

  a.   At one point during the chase, Miles's truck drove directly in front of Lieutenant Huffor's vehicle and nearly collided with him and multiple other vehicles.  Lieutenant Huffor continued to pursue Miles anyway, including as Miles drove westbound on Constitution Avenue at approximately 95 miles per hour, weaving between the traffic lanes and nearly colliding with several

vehicles along the way.

b.  Lieutenant Huffor pursued Miles onto northbound Marksheffel Road, where Lieutenant Huffer noted traffic was heavy and that Miles was weaving in and out of cars at 50-60 miles per hour.

c.  Lieutenant Huffor continued to pursue Miles when Miles drove onto the unpaved shoulder of a one lane road for approximately 30 seconds before erratically weaving back onto the road.  All the while, Lieutenant Huffor followed Miles.

d.  Lieutenant Huffor then remained in hot pursuit as Miles weaved in and out of the northbound and southbound lanes on Marksheffel, which Lieutenant Huffor noted caused multiple vehicles to swerve onto the shoulders of the road to avoid colliding with Miles.

e.  Lieutenant Huffor remained in pursuit of Miles as the chase headed into the City of Colorado Springs at speeds reaching 90-100 miles per hour.  As Miles continued to weave in and out traffic with Lieutenant Huffor following, Huffor watched as additional civilian vehicles had to veer out of the way and/or slam on their brakes to avoid a collision.

f.  Lieutenant Huffor still pursued Miles at 75-85 miles per hour as Miles crossed over into the eastbound lanes of Stetson Hills Boulevard while driving in a westbound direction, with Huffor following the same path, causing more civilian vehicles to swerve in order to avoid head-on collisions.

g.  Lieutenant Huffor continued to pursue Miles as the chase turned onto southbound Tutt Boulevard, where Lieutenant Huffor observed both north and

southbound motorists swerve onto the shoulders of the road to avoid colliding with Miles.

h.  Lieutenant Huffor continued to pursue Miles as he weaved around other EPSO patrol cars that were positioned to block Miles's path.  Lieutenant Huffor observed as Miles nearly rear-ended a civilian vehicle on Tutt Boulevard as the roadway headed downhill and curved to the left.  While Miles weaved into the oncoming lane to avoid the collision, Lieutenant Huffor swerved onto the right side shoulder of the road to avoid colliding into the vehicle.  In the process, Lieutenant Huffor nearly lost control of his EPSO vehicle but was able to steer out and continue his pursuit of Miles.

i.  As the pursuit continued westbound onto Barnes Road and crossed Powers Boulevard, Lieutenant Huffor observed as traffic became more congested.  As he wrote in his incident report, at that point Lieutenant Huffor decided the pursuit "had reached the point where it needed to be stopped as soon as possible to ensure the safety of the public."  Nevertheless, Lieutenant Huffor continued his pursuit of Miles at approximately 70-80 miles per hour as Miles crossed into the eastbound lanes on Barnes Road while driving westbound; this time Lieutenant Huffor did not follow Miles into oncoming traffic but rather stayed parallel to him from the westbound lanes.  Lieutenant Huffer then radioed to all units that he "was going to end the pursuit as soon as speeds slowed a little."

j.  As Lieutenant Huffor continued to pursue Miles, Miles slowed his truck down as he approached a red traffic signal on Austin Bluffs Parkway.  In an attempt to disable Miles's truck, Lieutenant Huffor decided to ram his EPSO vehicle

15

into Miles's truck.  The maneuver failed, however, as Miles was able to keep control of his truck and continue driving on with several EPSO deputies in pursuit.  Lieutenant Huffor's EPSO vehicle was disabled, with the airbags deployed, and Lieutenant Huffor observed a chaotic crash scene that included multiple civilian vehicles in addition to his wrecked EPSO vehicle.  Lieutenant Huffer was transported from the scene to Memorial Hospital by ambulance.

k.  Despite the multi-car crash, EPSO did not call off the pursuit and instead EPSO deputies continued pursuing Miles.

47.    Deputy Scott Brettell responded to the report of Miles stealing gas at the Safeway in Falcon only to observe Miles leaving the Safeway in his truck.  Deputy Brettell and other EPSO employees trailed Miles at a distance but Miles turned eastbound on Judge Orr road and "began to speed off at a high rate-of-speed."  Deputy Brettell was aware that Miles and his girlfriend previously led EPSO on a pursuit while, in Deputy Brettell's own words, "***driving at high rates-of-speed which were dangerous and a risk to law enforcement and the public.***"  (Emphasis added).  Nevertheless, Deputy Brettell pursued Miles on the afternoon of October 18, 2019, with Miles continuing to drive "at a high rate-of-speed."  Deputy Brettell's pursuit of Miles included the following incidents and observations:

a.  Due to heavy traffic conditions and Deputy Brettell's self-described "inability to stay with the pursuit," Deputy Brettell took side streets in an effort to cutoff Miles; Deputy Brettell in fact caught up with the chase and "attempted to force [Miles's] vehicle off the road unsuccessfully."

b.  Deputy Brettell then re-joined the pursuit on Barnes Road as Miles attempted to evade "at a high rate-of-speed."  Deputy Brettell wrote in his report, "We

continued westbound towards Austin Bluffs Boulevard with the Suspect Vehicle going into oncoming traffic multiple times, ***putting lives at extreme risk and showing due disregard for human life.***"  (Emphasis added).

c.   Deputy Brettell observed Lieutenant Huffor ram Miles's truck, which resulted in a traffic accident.  After the collision with Lieutenant Huffor, Deputy Brettell observed Miles reverse and ram other vehicles to get away.  Deputy Brettell rammed Miles, but Miles drove westbound down Austin Bluffs Boulevard and through side streets "at a high rate-of-speed" with himself, Deputy Juhl, and Deputy Witherite pursuing "at a high rate-of-speed."  Miles then led the chase back onto Austin Bluff Boulevard "***with disregard for public safety and causing great concern to myself and other deputies for the risk to public safety.***"  (Emphasis added).

d.   Despite these concerns over the risks to public safety, Deputy Brettell watched as Deputy Juhl rammed his EPSO vehicle into Miles's truck; in doing so, Deputy Juhl's EPSO vehicle was left "disabled" but Miles was able to continue on by driving into the "oncoming lanes on the wrong side of the road" on Austin Bluffs Parkway approaching Academy Boulevard.

e.   Deputy Brettell pursued Miles as Miles went through the intersection of Academy Boulevard and Austin Bluffs Parkway "at a high rate-of-speed" against a red traffic signal and struck several cars in the process.  Deputy Brettell, along with Deputy Witherite, then rammed their EPSO vehicles into Miles's truck, "pinching [Miles's truck] into several other vehicles."

f.   After apprehending Miles, Deputy Brettell conveyed to EPSO dispatch that

multiple vehicles were involved in the crash and that "medical aid" was needed.

48.     Deputy Nicholas Witherite responded to the call of Miles stealing gas at the Safeway in Falcon but Miles departed as Deputy Witherite was in route.  Deputy Witherite heard the radio calls that Miles was fleeing at a high rate of speed and "***passing vehicles recklessly by driving into oncoming traffic.***"  (Emphasis added).  Deputy Witherite also heard over the radio that Miles drove through a field before turning back onto Highway 24 driving in the wrong direction against oncoming traffic.  Deputy Witherite joined the pursuit as Lieutenant Huffor chased Miles on Barnes Road.  Deputy Witherite's pursuit of Miles included the following incidents and observations:

    a.  "The suspect was traveling at a high rate of speed as he swerved to avoid a head on collision with [Deputy Witherite's EPSO vehicle.]"  Deputy Witherite heard Miles's truck skid and watched as Miles "almost collided with two other vehicles."

    b.  Deputy Witherite remained in pursuit on Barnes Road, but recognized "heavy traffic in the area of Barnes Rd. and Powers Blvd."  Deputy Witherite observed Miles run red lights at multiple intersections.

    c.  According to Deputy Witherite, "[d]ue to the increasing amount of traffic and how reckless the suspect was driving, [Lieutenant] Huffor advised once there was an opportunity to terminate the fleeing vehicle he was going to attempt to stop the pursuit."  Deputy Witherite observed as Lieutenant Huffor rammed Miles's truck, which caused Miles's truck to spin out and Lieutenant Huffor's EPSO vehicle to hit a curb and go "airborne."  As Miles reversed and sped away, Deputy Witherite drove up and over the median and pursued Miles.

d.  Deputy Witherite, while in pursuit, observed as Miles drove the wrong way into oncoming traffic on Austin Bluffs Parkway, turned onto Date Street and nearly collided head on with a civilian vehicle, which had to veer off the roadway to avoid the collision.

e.  Deputy Witherite continued in pursuit of Miles as he was involved in a crash at Austin Bluffs Parkway and Siferd Road with Deputy Juhl, who attempted to ram Miles, and a civilian vehicle.

f.  Deputy Witherite remained in pursuit of Miles as he sped away from the second multi-vehicle crash by driving the wrong direction on Austin Bluff Parkway. Deputy Witherite continued in pursuit as Miles ran the red light at Austin Bluffs Parkway and Academy Boulevard and as Miles collided into several different vehicles in the intersection before coming to a rest.  Deputy Witherite followed and rammed his EPSO vehicle into Miles's truck to prevent Miles from moving.

g.  Deputy Witherite assisted Deputy Brettell take Miles and his girlfriend into custody at gun point.  Deputy Witherite then "began assessing the multiple crash scenes and tending to injuries."

49.  Deputy Jeremy Juhl responded to the report of Miles stealing gas at the Safeway in Falcon and observed Miles leaving the Safeway in his truck and turn east on Highway 24.  Deputy Juhl and other EPSO employees trailed Miles at a distance but Miles sped away after he was spotted by an unmarked police car.  Deputy Juhl lost sight of Miles and began driving down sideroads in the hopes of locating him.  Deputy Juhl rejoined the pursuit on Barnes Road and was second in line after Lieutenant Huffor, who was in hot pursuit behind Miles.  Deputy Juhl's pursuit of Miles included the following incidents and observations:

a.  "[Miles]" was driving at a high rate of speed through this entire pursuit."

b.  "Lieutenant Huffor advised to stop the pursuit as early as possible, meaning a tactical vehicle intervention (TVI)."

c.  Deputy Juhl remained in pursuit as he watched Lieutenant Huffor attempt, unsuccessfully, to ram Miles's truck.  Deputy Juhl observed Miles "hit several other vehicles in the intersection during this time."

d.  Deputy Juhl continued in pursuit after the first multi-vehicle crash and intercepted Miles as he turned westbound in the eastbound lanes on Austin Bluffs Parkway.  Deputy Juhl "took this opportunity to try and stop [Miles's] reckless and careless driving" by ramming his EPSO vehicle into Miles's truck at the intersection of Austin Bluffs Parkway and Siferd Road.  The impact caused Deputy Juhl's EPSO vehicle and Miles's truck to spin out while attached together.  But after coming to a rest, Miles was able to reverse his truck out of the wreckage, go over the median, and speed away into oncoming traffic lanes on Austin Bluffs Parkway toward Academy Boulevard.

e.  Deputy Juhl's EPSO vehicle crashed into a civilian vehicle and was rendered inoperable.  Deputy Juhl watched from his disabled EPSO vehicle as Miles blew through the red light at Austin Bluffs Parkway and Academy Boulevard and slammed into multiple vehicles before coming to a rest against Plaintiff Wren's unmarked Colorado Springs Police Department vehicle.  Deputy Juhl also observed as Deputies Brettell and Witherite followed Miles through the red light and rammed their EPSO vehicles into Miles's truck to pin him in.  Deputy Juhl then ran on foot to the wreckage to aid in apprehending Miles and his

girlfriend.  Deputy Juhl used a weapon to break out the rear passenger window of Miles's truck; after Miles and his girlfriend were taken into custody, Deputy Juhl returned to the scene of the second multi-car collision and waited with his disabled EPSO vehicle for help to arrive.

50.     Deputy Robert Frederiksen joined the pursuit when Miles sped past him "at a high rate of speed."  Deputy Frederiksen observed Miles continue speeding away "at a high rate of speed" and drive into oncoming lanes of traffic to pass motorists for a considerable distance. According to Deputy Frederiksen, Miles "was driving at such a high speed that I was unable to catch up to [him] to keep [him] in my line of sight."  Deputy Frederiksen caught up and rejoined the pursuit as Lieutenant Huffer rammed Miles's truck.  Because of the damage to Lieutenant's Huffor's EPSO vehicle, Deputy Frederiksen stopped at the first multi-vehicle crash scene "to help Lieutenant Huffor and other civilians that were possibly hurt in the car accident."

51.     Deputy Meyer joined the pursuit and parked his EPSO vehicle in an intersection along the chase route "in an effort to stop traffic and hopefully prevent a traffic accident."  Deputy Meyer observed as Miles's truck sped by, at which time Deputy Meyer joined the chase "but moved out of the way as traffic and speeds did not allow me to keep up with the pursuit."

52.     Deputy Greg Stoneham joined the pursuit of Miles and positioned his EPSO vehicle in an intersection along the chase route in an effort to block Miles's path.  Deputy Stoneham observed Miles's truck head directly at his EPSO vehicle "and then swerve at the last minute into oncoming traffic" and proceed onto Barnes Road.

53.     Thus, as set forth above, at least nine different EPSO employees, including an EPSO Lieutenant high in the chain of command, participated in the lengthy, high-speed chase of Miles through El Paso County and into the City of Colorado Springs despite having knowledge

that: the speeds of the pursuit reached 100 miles per hour; traffic conditions were heavy; Miles frequently drove into oncoming traffic and endangered the safety and lives of countless motorists; Miles was driving in a reckless, careless manner; Miles was weaving in and out of traffic and civilians had to swerve off the roadway to avoid collisions; Miles was "driving at high rates-of-speed which were dangerous and a risk to law enforcement and the public;" and three separate multi-vehicle crashes occurred along the way.  Despite their collective knowledge that the high-speed pursuit was dangerous and put the safety of the public at risk, EPSO employees never called off the pursuit and instead continued the pursuit all across El Paso County and into the city limits of Colorado Springs for nearly one hour.

### EPSO Employees Violated EPSO Policy in the Pursuit

54.     EPSO had a Policy Manual in effect on the date of the pursuit of Miles at issue in this case.  EPSO's Policy Manual included a policy section for "Vehicle Pursuits" stating "[t]his policy provides guidelines for vehicle pursuits in order to protect the safety of involved deputies, the public and fleeing suspects."  EPSO's Vehicle Pursuits policy in place as of October 18, 2019, contained several sections applicable to the pursuit of Miles.

55.     Section 403.2, titled "Policy," stated "It is the policy of this Office to weigh the importance of apprehending suspects who unlawfully flee from law enforcement against the risks associated with vehicle pursuits."

56.     Section 403.3, titled "Deputy Responsibilities," stated "Deputies shall drive with due regard for the safety of all persons and property. However, deputies may, when in pursuit of a suspect and provided there is no unreasonable risk to persons and property:

        a.   Proceed past a red or stop signal or stop sign but only after slowing down as may be necessary for safe operation.

b.   Exceed the speed limit (CRS § 42-4-108(2)(c)).

c.   Disregard regulations governing direction of movement or turning in specified directions.

57.   Section 403.3.1 stated "Factors that shall be considered, both individually and collectively, when deciding to initiate or continue a pursuit include, but are not limited to:

a.   The seriousness of the known or reasonably suspected crime and its relationship to community safety.

b.   The importance of protecting the public and balancing the known or reasonably suspected offense and the apparent need for immediate capture against the risks to deputies, innocent motorists and others (CRS § 42-4-108).

c.   The safety of the public in the area of the pursuit, including the type of area, time of day, the amount of vehicular and pedestrian traffic (e.g., school zones) and the speed of the pursuit relative to these factors.

d.   The pursuing deputies' familiarity with the area of the pursuit, the quality of radio communications between the pursuing vehicles and the dispatcher/supervisor, and the driving capabilities of the pursuing deputies under the conditions of the pursuit.

e.   Whether weather, traffic and road conditions unreasonably increase the danger of the pursuit when weighed against the risks resulting from the suspect's escape.

f.   Whether the identity of the suspect has been verified and whether there is comparatively minimal risk in allowing the suspect to be apprehended at a later time.

g.  The performance capabilities of the vehicles used in the pursuit in relation to the speed and other conditions of the pursuit.

h.  Emergency lighting and siren limitations on unmarked sheriff's Office vehicles that may reduce visibility of the vehicle, such as visor or dash-mounted lights, concealable or temporary emergency lighting equipment and concealed or obstructed siren positioning.

i.  Vehicle speeds.

j.  Other persons in or on the pursued vehicle (e.g., passengers, co-offenders and hostages).

k.  The availability of other resources, such as aircraft assistance.

l.  Whether the pursuing vehicle is carrying passengers other than on-duty sheriff's deputies. Pursuits should not be undertaken with an arrestee in the pursuit vehicle unless exigent circumstances exist, and then only after the need to apprehend the suspect is weighed against the safety of the arrestee in transport. A vehicle containing more than a single arrestee should not be involved in a pursuit.

58.  Section 403.3.2, titled "When to Terminate a Pursuit," stated:

Pursuits should be terminated whenever the totality of objective circumstances known or which reasonably ought to be known to the deputy or supervisor during the pursuit indicates that the present risk of continuing the pursuit reasonably appears to outweigh the risk resulting from the suspect's escape.

When a supervisor directs the pursuit to be terminated, deputies will immediately terminate the pursuit.

The factors listed in this policy on when to initiate a pursuit will apply equally to the decision to terminate a pursuit. Deputies and supervisors must objectively and continuously weigh the seriousness of the offense against

24

the potential danger to innocent motorists, themselves and the public when electing to continue a pursuit.

In addition to the factors that govern when to initiate a pursuit, other factors should be considered when deciding whether to terminate a pursuit, including:

(a) The distance between the pursuing vehicle and the fleeing vehicle is so great that further pursuit would be futile or require the pursuit to continue for an unreasonable time or distance.

(b) The pursued vehicle's location is no longer definitely known.

(c) The pursuing vehicle sustains damage or a mechanical failure that renders it unsafe to drive.

(d) The pursuing vehicle's emergency lighting equipment or siren becomes partially or completely inoperable.

(e) Hazards to uninvolved bystanders or motorists.

(f) The danger that the continued pursuit poses to the public, the deputies or the suspect, balanced against the risk of allowing the suspect to remain at large.

(g) The identity of the suspect is known and it does not reasonably appear that the need for immediate capture outweighs the risks associated with continuing the pursuit.

(h) Extended pursuits of violators for misdemeanors not involving violence or weapons (independent of the pursuit) are generally discouraged.

59.     Section 403.4, titled "Patrol Units," stated:

When involved in a pursuit, unmarked Sheriff's Office emergency vehicles should be replaced by marked emergency vehicles whenever practicable.

Vehicle pursuits should be limited to three sheriff's Office vehicles (two units and a supervisor).  However, the number of vehicles involved will vary with the circumstances.

A deputy or supervisor may request that additional vehicles join a pursuit if, after assessing the factors outlined above, it appears that the number of deputies involved would be insufficient to safely arrest the number of suspects. All other deputies shall stay out of the pursuit but should remain alert to its progress and location. Any deputy who drops out of a pursuit may

then, if necessary, proceed to the pursuit termination point at legal speeds, following the appropriate rules of the road.

60.     Section 403.5, titled "Pursuit Driving," stated, among other things,

As a general rule, deputies should not pursue a vehicle driving the wrong direction on a roadway, highway or freeway. In the event the pursued vehicle does so, the following tactics should be considered:

(a) Maintain visual contact with the pursued vehicle by paralleling the vehicle while driving on the correct side of the roadway.

(b) Request other deputies to observe exits available to the suspect.

61.     Section 403.5.2, titled "Deputies Not Involved in the Pursuit," stated that EPSO deputies not directly involved in the pursuit should attempt to warn and clear traffic at intersections ahead of the pursuit in order to "protect the public."

62.     Section 403.6.1, titled "Lieutenant Responsibilities," stated "Upon becoming aware that a pursuit has been initiated, the Lieutenant should monitor and continually assess the situation and ensure the pursuit is conducted within the guidelines and requirements of this policy. The Lieutenant has the final responsibility for the coordination, control and termination of a vehicle pursuit and shall be in overall command."

63.     Section 403.10.3, titled "Intervention Standards," placed strict limitations on the use of a ramming technique, stating:

Ramming a fleeing vehicle should be done only after other reasonable tactical means at the deputy's disposal have been exhausted or would not be effective, and immediate control is necessary. Ramming should be reserved for situations where there does not appear to be another reasonable alternative method. If there does not reasonably appear to be a present or immediately foreseeable serious threat to the public, the use of ramming is not authorized. When ramming is used as a means to stop a fleeing vehicle, the following factors should be present:

1. The suspect is an actual or suspected felon, who reasonably appears to represent a serious threat to the public if not apprehended.

2. The suspect is driving with willful or wanton disregard for the safety of other persons or is driving in a reckless and life-endangering manner or using the vehicle as a weapon.

64.     Section 403.14, titled "Policy Review," stated, "Deputies of this Office shall certify in writing that they have received, read and understand this policy initially, upon any amendments and whenever training on the policy is provided."

65.     In their pursuit of Miles, the EPSO employees violated the foregoing EPSO Vehicle Pursuits policies and guidelines as follows:

a.   The EPSO employees failed to weigh the importance of apprehending Miles against the risks associated with vehicle pursuits.  The EPSO employees did not consider, or disregarded, the risks associated with the pursuit of Miles.

b.   While EPSO employees pursued Miles, there was present at all times unreasonable risks to persons and property.  Despite the presence of unreasonable risks to persons and property (including to the EPSO employees, EPSO vehicles, and civilians), EPSO employees blew through red/stop signals, exceeded the speed limits (indeed, EPSO employees frequently drove at speeds ranging from 70 to 100 miles per hour during the pursuit), and frequently chased after Miles while driving the wrong direction on roadways against oncoming traffic.

c.   The EPSO employees pursuing Miles failed to take into account the factors in the EPSO Policy Manual governing when to initiate and continue a pursuit.

d.   EPSO employees failed to factor in the importance of protecting the public and balancing the known suspected offenses committed by Miles (which primarily involved property crimes and vehicles thefts) and the need to immediately

capture Miles against the risks posed to deputies, innocent motorists, and others along the chase route.  The risks to EPSO deputies and innocent motorists in pursuing Miles outweighed the need to immediately capture Miles.

e.  EPSO employees failed to take into account the safety of the public in the areas of the pursuit of Miles.  EPSO employees chased Miles into the City of Colorado Springs on a Friday afternoon down heavily trafficked streets and intersections while driving at high rates of speed and at times against oncoming traffic.  The pursuit resulted in three separate multi-vehicle crashes in which members of the public suffered injuries to person and property.

f.  EPSO employees failed to consider that the heavy traffic conditions unreasonably increased the dangers presented by EPSO's pursuit of Miles and outweighed the risks resulting from Miles's escape.

g.  EPSO employees failed to consider that EPSO knew Miles's identity and knew his whereabouts.  There was relatively minimal risk in taking action to apprehend Miles later that day, night, or the following days.

h.  EPSO employees failed to consider the high rates of speed at which Miles and the pursuing EPSO employees were driving, which speeds reached 100 miles per hour.

i.  EPSO employees failed to consider the availability of other resources, such as aircraft assistance.  Upon information and belief, EPSO could have requested helicopter or other airborne assistance to track Miles.

j.  EPSO employees failed to objectively and continuously weigh the need to apprehend Miles against the dangers presented to innocent motorists,

themselves, and the public by continuing to pursue Miles.

k.  EPSO employees failed to take into consideration that their pursuit of Miles
continued for an unreasonable duration (approximately one hour) and covered
a lengthy distance (starting in Falcon and proceeding into Colorado Springs).

l.  And the EPSO employees failed to consider the unreasonable and dangerous
hazards that the ongoing pursuit posed to the public.  Countless members of the
public were forced to swerve off roadways to avoid Miles and the pursuing
EPSO vehicles; three multi-vehicle crashes occurred during the pursuit in which
members of the public suffered injuries to their person and/or property; and the
circumstances of the pursuit made it reasonably apparent that collisions and
damage were certain to occur.

66.  EPSO employees also violated the EPSO Vehicle Pursuits policy by failing to
replace Lieutenant Huffer, who was pursuing Miles while driving his unmarked EPSO vehicle,
with a marked EPSO vehicle.  Lieutenant Huffor knew several marked EPSO vehicles were in
pursuit but continued the chase while driving his unmarked EPSO vehicle at speeds between 70
and 100 miles per hour and ramming Miles at an intersection, which caused a crash with innocent
civilian motorists.

67.  EPSO employees also violated EPSO Vehicle Pursuits policy by failing to adhere
to the guideline limiting vehicle pursuits to three EPSO vehicles.  EPSO had up to ten vehicles
pursuing Miles.

68.  EPSO employees also violated EPSO Vehicle Pursuits policy by failing to have
deputies stop and control traffic at intersections ahead of the pursuit, and by failing to exercise due
caution while pursuing Miles through intersections.  Instead, EPSO employees rammed Miles's

truck three separate times in three separate intersections, all of which resulted in multi-vehicle crashes involving EPSO vehicles, Miles, and civilian motorists.

69.     EPSO employees also violated EPSO Vehicle Pursuits policies by pursuing Miles while driving the wrong direction down roadways against oncoming traffic.

70.     Lieutenant Huffor violated EPSO Vehicle Pursuits policy requiring the Lieutenant to monitor and continually assess the situation to ensure EPSO's pursuit of Miles stayed within the EPSO pursuit policy.  Although Lieutenant Huffor had final responsibility for the coordination, control and termination of the pursuit of Miles, Lieutenant Huffor disregarded his duties and instead personally joined, and in fact led, the pursuit of Miles.  As an active participant in the pursuit, Lieutenant Huffor was not in a position to monitor and continually assess the situation from an objective, big-picture perspective.

71.     Lieutenant Huffor and Deputy Juhl violated EPSO Vehicle Pursuits policy by ramming Miles's truck in busy intersections with civilian motorists present.  The serious threat to the safety of the public was immediately foreseeable in each instance, and in each instance Lieutenant Huffor's and Deputy Juhl's decisions to ram Miles resulted in multi-vehicle crashes involving civilian motorists.

72.     Each of the EPSO employees involved were required to certify in writing that they received, read, and understood EPSO's Vehicle Pursuits policy.  Upon information and belief, each of the EPSO employees so certified that they received, read, and understood the EPSO Vehicle Pursuits policy.  Yet the EPSO employees violated the EPSO Vehicle Pursuits policy numerous times and ways while pursuing Miles on October 18, 2019.

73.     As a result of EPSO employees violating the EPSO Vehicle Pursuits policy, numerous members of the public, including Plaintiff Steve Wren, were injured.

### Sheriff Elder Monitored the Pursuit but Failed to Intervene and Call it Off

74.     Sheriff Elder was the top law enforcement officer within EPSO on October 18, 2019.  Sheriff Elder stated that he and other top aides were actively monitoring EPSO's pursuit of Miles.  Upon information and belief, Sheriff Elder heard the radio calls depicting the pursuit in real time, and knew the pursuit reached speeds of 100 miles per hour; knew the pursuit took Miles and EPSO employees across El Paso County while driving the wrong direction against oncoming traffic numerous times; knew that countless civilian motorists had to swerve off the roadways to avoid collisions; knew that several near-miss collisions occurred during the lengthy pursuit; knew that the pursuit entered into the city limits of Colorado Springs where traffic conditions were heavy and the dangers and risks presented to civilians were high; knew that EPSO employees planned and carried out multiple ramming maneuvers on Miles's truck while in the presence of civilian motorists, causing wrecks with civilians in the process; knew that three multi-vehicle crashes including civilian motorists occurred during the pursuit; knew that Lieutenant Huffor joined the pursuit and was not in a position to objectively monitor and assess the situation to ensure compliance with EPSO Vehicle Pursuits policy, which left a void in the designed vehicle pursuit leadership protocol; and knew that EPSO was aware of Miles's identity and whereabouts.

75.     Despite this knowledge, Sheriff Elder failed to take action to intervene in the pursuit, failed to assess the situation to determine if the pursuit should be called off in light of the grave dangers the pursuit presented to the public, and failed to ensure EPSO employees complied with the EPSO Vehicle Pursuits policy.  Instead, Sheriff Elder took no action whatsoever and just listened to the pursuit unfold over the radio.

76.     As a result of Sheriff Elder's failure to take action, no one at EPSO assessed the situation and ensured EPSO Vehicle Pursuits policy and guidelines were followed.  Due to EPSO's

failures to follow the EPSO Vehicle Pursuits policy, the pursuit of Miles continued on until a trail of wreckage was left behind that included damage to several EPSO vehicles, injuries to EPSO employees, damage to several civilian vehicles, and injuries to multiple civilians, including Plaintiff Steven Wren.

77.     The circumstances of EPSO's pursuit of Miles were such that it was not a matter of if but when serious injuries and damage would occur.  Unfortunately for Plaintiff Steven Wren, he suffered serious career ending bodily injuries as a result of EPSO's pursuit of Miles.

## CLAIM FOR RELIEF
### (Negligence - Against all Defendants)

78.     The preceding allegations are hereby incorporated as though fully set forth herein.

79.     Defendants owed Mr. Wren a duty to exercise reasonable and ordinary care in connection with their pursuit of Miles, including the duties to:

   a.   Protect the safety of those involved and the public-at-large;

   b.   weigh the importance of apprehending suspects against the risks associated with vehicle pursuits;

   c.   drive with due regard for the safety of all persons and property;

   d.   refrain from proceeding past red/stop signals when unreasonable risks to persons and property are present;

   e.   refrain from exceeding the speed limit when unreasonable risks to persons and property are present;

   f.   refrain from disregarding regulations governing direction of movement or turning in specified directions when unreasonable risks to persons and property are present;

   g.   position deputies at intersections ahead of the pursuit in an effort warn and

control traffic and civilians ahead;

h.  exercise due caution and slow down at intersections;

i.  refrain from pursuing fleeing suspects driving the wrong direction on a roadway;

j.  only employ intervention tactics after having balanced the risk of allowing the pursuit to continue with the potential hazards arising from the use of intervention tactics;

k.  only using intervention tactics reasonably in light of the circumstances;

l.  only employing a ramming maneuver after other reasonable tactical means have been exhausted and there does not appear to be a present or immediately foreseeable serious threat to the public;

m.  consider and weigh the need for immediate capture of the suspect against the risks of harm to deputies, innocent motorists, and others;

n.  consider traffic conditions, the time of day, the type of area, and speed of the pursuit when weighing the risks to the public's safety;

o.  consider whether the known identity of the suspect minimizes the risk in allowing apprehension of the suspect at a later time;

p.  consider the vehicle speeds of the fleeing suspect and pursuing deputies;

q.  consider the availability of other resources, such as aircraft;

r.  terminate a pursuit when the totality of objective circumstances known or which reasonably ought to be known to the deputies and supervisors during the pursuit indicate that the present risk of continuing the pursuit appears to outweigh the risk resulting from the suspect's escape;

      s.   terminate a pursuit when it continues on for an unreasonable time and/or distance;

      t.   terminate a pursuit when hazards arise to uninvolved bystanders or motorists; and

      u.   terminate a pursuit when the danger that the continued pursuit poses to the public, the deputies or the suspect outweighs the risk of allowing the suspect to remain at large.

80.    Defendant Huffor owed Mr. Wren the additional duty to drop out of the pursuit in his unmarked EPSO vehicle once other EPSO deputies were available to take over; to oversee, monitor, and continually assess the situation to ensure the pursuit was conducted within EPSO policies and guidelines; and to terminate the pursuit when the danger that the continued pursuit posed to the public, the deputies and/or Miles outweighed the risk of apprehending Miles at a later date.

81.    Defendant Elder owed Mr. Wren the additional duty to oversee, monitor, and assess the pursuit to ensure it was being conducted in compliance with EPSO policies and guidelines as he knew Lieutenant Huffor was personally engaged in the pursuit and not filling the supervisory role required in the EPSO Vehicle Pursuits policy. Defendant Elder owed a duty to terminate the pursuit when the danger that the continued pursuit posed to the public, the deputies and/or Miles outweighed the risk of apprehending Miles at a later date.

82.    The EPSO employees, including the individual EPSO employees named as Defendants herein, breached the duty of care they owed to Mr. Wren when they:

      a.   engaged and continued in the high-speed pursuit of Miles across El Paso County while reaching speeds of up to 100 miles per hour;

b.  chased Miles the wrong direction down roadways and into oncoming traffic;

c.  failed to protect the safety of those involved and the public at large, and instead allowed the pursuit to continue while countless innocent civilian motorists had to swerve off the roadways to avoid collisions and while other innocent civilian motorists became victims in three separate multi-vehicle collisions that occurred as a result of the pursuit;

d.  failed to weigh the importance of apprehending Miles immediately, whose identity and whereabouts were well-known to EPSO, against the minimal risk of apprehending Miles later, as well as the high risks of danger associated with the lengthy, high-speed pursuit of Miles;

e.  failed to drive with due regard for the safety of all persons and property, and instead drove EPSO vehicles at speeds reaching 100 miles per hour and into oncoming traffic despite open and obvious risks of danger to persons and property in doing so;

f.  proceeded past red/stop signals when unreasonable risks to persons and property were present;

g.  exceeded the speed limit when unreasonable risks to persons and property were present;

h.  failed to position deputies at intersections ahead of the pursuit in an effort warn and control traffic and civilians ahead;

i.  failed to exercise due caution and slow down at intersections;

j.  employed a ramming maneuver three separate times despite the presence of foreseeable serious threat, danger, and harm to the public, including causing

multiple crashes with civilian motorists in the process;

k.  failed to consider the heavy traffic conditions, the time of day (a Friday afternoon with many civilians on the roadways), the type of area (the pursuit went from Falcon into heavily trafficked areas within the city limits of Colorado Springs), and speed of the pursuit (speeds reached 100 miles per hour) when weighing the risks to the public's safety;

l.  failed to consider and employ other resources, such as aircraft, to track Miles in a manner that reduced the risks of harm the pursuit posed to the public; and

m.  failed to terminate the pursuit when the totality of objective circumstances known or which reasonably ought to have been known to the deputies and supervisors during the pursuit (including the high rates of speed; the nearly one hour timeframe and lengthy distance of the pursuit; the number of times the pursuit went down the wrong direction of roadways and into oncoming traffic; the numerous near-miss collisions involving civilians; and the three multi-vehicle crashes involving civilians that occurred during and as a result from the pursuit) indicated that the present risk of continuing the pursuit outweighed the risk resulting from Miles's escape.

83.  Defendant Huffor breached the duties of care that he owed Mr. Wren when he failed to drop out of the pursuit in his unmarked EPSO vehicle once other EPSO deputies were available to take over; when he failed to oversee, monitor, and continually assess the situation to ensure the pursuit was conducted within EPSO policies and guidelines; and when he failed to terminate the pursuit when the danger that the continued pursuit posed to the public, the deputies and/or Miles outweighed the risk of apprehending Miles at a later date.

84.  Defendant Elder breached the duties of care that he owed Mr. Wren when he failed to oversee, monitor, and assess the pursuit to ensure it was being conducted in compliance with EPSO policies and guidelines in Lieutenant Huffor's absence, and when he failed to terminate the pursuit when the danger that the continued pursuit posed to the public, the deputies and/or Miles outweighed the risk of apprehending Miles at a later date.

85.  Defendants EPSO and El Paso County are vicariously liable for the negligence of the EPSO employees involved in the pursuit of Miles, which caused damages, injuries, and losses to Mr. Wren, pursuant to the doctrine of *respondeat superior* as all of the EPSO employees were acting within the course and scope of their employment as deputy, lieutenant, and/or sheriff with EPSO during all times relevant to the allegations and claims set forth herein.

86.  Pursuant to C.R.S. § 24-10-106(1)(a) and C.R.S. § 42-4-108(2), the sovereign immunity that Defendants EPSO and El Paso County otherwise enjoy is waived as Mr. Wren suffered injuries, damages, and losses caused by EPSO employees operating EPSO vehicles within the course and scope of their employment while:

    a.  exceeding the lawful speed limits in a manner that endangered the lives and property of EPSO employees, innocent motorists, and the public at large, and

    b.  proceeding past/through red or stop signals without first failing to slow down as was necessary for safe operation.

87.  Pursuant to C.R.S. § 24-10-118(2)(a), C.R.S. § 24-10-106(1)(a), and C.R.S. § 42-4-108(2), the qualified immunity that Defendants Huffor, Brettell, Witherite, and Juhl otherwise enjoy is waived as Mr. Wren suffered injuries, damages, and losses caused by their operation of EPSO vehicles within the course and scope of their employment while:

    a.  exceeding the lawful speed limits in a manner that endangered the lives and

property of EPSO employees, innocent motorists, and the public at large, and

b.  proceeding past/through red or stop signals without first failing to slow down as was necessary for safe operation.

88.     Pursuant to C.R.S. § 24-10-118(1) and (2)(a), the qualified immunity that Defendants Elder, Huffor, Brettell, Witherite, and Juhl otherwise enjoy is waived as their conduct was willful and wanton.

89.     As alleged earlier, which allegations are hereby incorporated as though fully set forth herein, Sheriff Elder was actively monitoring the pursuit of Miles and knew that:

a.  EPSO had a Vehicle Pursuits policy in place at the time of the pursuit of Miles;

b.  Lieutenant Huffor was not overseeing and monitoring the pursuit;

c.  the pursuit reached excessive speeds of 100 miles per hour, extended across El Paso County and into the Colorado Springs city limits, and went on for nearly one hour;

d.  numerous civilians and innocent motorists had to swerve off the roadways and narrowly missed collisions with the vehicles in the pursuit;

e.  traffic was heavy as the pursuit entered into the Colorado Springs city limits;

f.  on two separate occasions EPSO employees rammed Miles but were unsuccessful in disabling his truck and caused collisions with innocent civilians in the process;

g.  three separate multi-vehicle crashes occurred in which innocent civilians and EPSO employees and property were damaged and injured; and

h.  EPSO knew Miles's identity and whereabout and could have joined other law enforcement agencies to apprehend Miles at a later date and time when the risks

to the public were minimized.

90.     Despite this knowledge of the potential and actual dangers and risks of harm that the lengthy high-speed chase of Miles presented to those involved and the public-at-large, Sheriff Elder declined to call off the pursuit and instead allowed the pursuit to continue on.  In doing so, Sheriff Elder acted in knowing disregard of the dangers and risks of harm the EPSO pursuit of Miles presented to the public.

91.     As alleged earlier, which allegations are hereby incorporated as though fully set forth herein, Lieutenant Huffor and Deputies Brettell, Witherite, and Juhl actively participated in the pursuit of Miles while possessing knowledge that:

    a.  EPSO had a Vehicle Pursuits policy in place at the time of the pursuit of Miles;

    b.  Lieutenant Huffor was not overseeing and monitoring the pursuit, but rather was actively participating in the pursuit driving his unmarked EPSO vehicle;

    c.  the pursuit reached excessive speeds of 100 miles per hour, extended across El Paso County and into the Colorado Springs city limits, and went on for nearly one hour;

    d.  numerous civilians and innocent motorists had to swerve off the roadways and narrowly missed collisions with the vehicles in the pursuit;

    e.  traffic was heavy as the pursuit entered into the Colorado Springs city limits;

    f.  on two separate occasions EPSO employees rammed Miles but were unsuccessful in disabling his truck and caused collisions with innocent civilians in the process;

    g.  three separate multi-vehicle crashes occurred in which innocent civilians and EPSO employees and property were damaged and injured; and

> h.   EPSO knew Miles's identity and whereabout and could have joined other law enforcement agencies to apprehend Miles at a later date and time when the risks to the public were minimized.

92.     Despite this knowledge of the potential and actual dangers and risks of harm that the lengthy high-speed chase of Miles presented to those involved and the public-at-large, Lieutenant Huffor and Deputies Brettell, Witherite, and Juhl failed to call off the pursuit and instead continued on with the pursuit while placing themselves, innocent motorists, and the public-at-large in grave danger.  In doing so, Lieutenant Huffor and Deputies Brettell, Witherite, and Juhl acted in knowing disregard of the dangers and risks of harm the EPSO pursuit of Miles presented to the public.

93.     As a result of Defendants' respective breaches of the duties of care they owed Mr. Wren, as well as Defendants' respective willful and wanton conduct, Mr. Wren suffered injuries, damages, and losses, including severe injuries that ended Mr. Wren's career.

94.     Defendants' breaches of the duties of care they owed to Mr. Wren, as well as Defendants' willful and wanton conduct, proximately caused injuries, damages, and losses to Mr. Wren in an amount to be determined at trial, including direct, indirect, and consequential economic damages; non-economic damages for pain and suffering, emotional distress, mental anguish, loss of enjoyment of life, inconvenience, and increased risk of harm; and permanent impairment/disfigurement.

## **JURY DEMAND**

95.     Mr. Wren hereby demands a trial by jury on all claims so triable.

WHEREFORE, Plaintiff Steven Wren prays for judgment against Defendants El Paso County Sheriff's Office, El Paso County, Sheriff Elder, Lieutenant Huffor, Deputy Brettell,

Deputy Witherite, and Deputy Juhl, jointly and severally, for the damages, injuries, and losses he has suffered as a result of Defendants' negligence and willful and wanton conduct; an award of all economic, non-economic, general and special damages suffered by Mr. Wren; an award of attorneys' fees, costs and pre and post-judgment interest pursuant to applicable rule and/or statute; and for such other and further relief as this Court deems just and proper.

Respectfully submitted this 15th day of October, 2022.

*s/* Zachary P. Mugge
Zachary P. Mugge
John E. Lintzenich
Antero Law, LLC
1700 Broadway, Suite 640
Denver, CO 80290
(720) 990-5530
zmugge@anterolaw.com
jlintzenich@anterolaw.com
*Attorneys for Plaintiff*